# Exhibit 6:

Journal of Passthrough Entities: *State Law & State Taxation Corner: Supreme Court to Take Another Look at State Unclaimed Property Priority Rules*
(January – February 2017)

# State Law & State Taxation Corner

## Supreme Court to Take Another Look at State Unclaimed Property Priority Rules

*By John A. Biek*

## Introduction

Every decade or two, the U.S. Supreme Court agrees to decide a multi-state dispute over which state is entitled to claim custody of an unclaimed property item from the business (referred to as the "holder") owing payment of the property item to its apparent owner. The Supreme Court's 1965 opinion in *Texas v. New Jersey* formulated the two priority rules still utilized today to identify the state entitled to claim the unclaimed property item from the holder.[1] The Supreme Court reaffirmed these priority rules in 1972 in *Pennsylvania v. New York*,[2] and again in 1993 in *Delaware v. New York*,[3] to resolve competing state claims to unclaimed traveler's checks and corporate dividend payments, respectively. Two years after the *Pennsylvania v. New York* decision, Congress enacted the Disposition of Abandoned Money Orders and Traveler's Checks Act, codified as 12 USC §§2501–2503 (the "Federal Disposition Act"), which created a special set of federal statutory priority rules applicable to any unclaimed "money order, traveler's check, or other similar written instrument (other than a third-party bank check) on which a banking or financial organization or a business association is directly liable."[4]

On October 3, 2016, the Supreme Court agreed to allow a group of 21 plaintiff states to file a complaint with the Supreme Court, pursuant to its original jurisdiction powers, to challenge Delaware's escheatment of unclaimed funds associated with uncashed "official checks" issued and sold by MoneyGram Payment Systems, Inc.[5] This *Arkansas v. Delaware* case presents the question of whether these official checks constituted "money orders" or "other similar written instruments (other than third party bank checks)" claimable by the states in which those official checks were sold, pursuant to the special federal statutory priority rules of 12 USC §§2501–2503, as the plaintiff states contend, or whether the official checks were ordinary check instruments subject to the federal common law priority rules of *Texas v. New Jersey*. If it is the latter, Delaware would have correctly claimed custody of all of the unclaimed official check funds in its capacity as MoneyGram's state of incorporation. This *Arkansas v. Delaware* litigation is only just underway, but, hopefully, the Supreme Court will approach the case as one of statutory construction of the critical (but undefined) terms "money order" and "other similar written instrument (other than a third party bank check)"

Wolters Kluwer®



**JOHN A. BIEK** is a Partner in the Tax Practice Group of Neal, Gerber & Eisenberg LLP in Chicago, Illinois (*jbiek@ngelaw.com*).

 © 2017 CCH INCORPORATED AND ITS AFFILIATES. ALL RIGHTS RESERVED. 

rather than reconsider the *Texas v. New Jersey* priority rules that have worked fairly well for holders and the states for over 50 years.

## Development of the Supreme Court Unclaimed Property Priority Rules

In the late 1940s and early 1950s, the U.S. Supreme Court was presented with several cases in which a state was attempting to require a holder to report unclaimed property items to the state based on the state's claim that it had jurisdiction under the Due Process Clause to apply its abandoned property laws to the holder and the property items were presumed abandoned under the state's laws. In *Connecticut Mutual Life Insurance Co. v. Moore*,[6] the Supreme Court upheld New York's right to take custody of unclaimed proceeds of insurance policies that the defendant insurance companies had issued on the lives of New York residents. Applying a due process "contacts" analysis, the Supreme Court held that, even though none of the defendant insurance companies were incorporated in New York, the state nevertheless had jurisdiction to require the insurance companies to report the property items to New York because the insurance companies were doing business in New York and the insureds resided in New York.[7] The Supreme Court noted in its *Connecticut Mutual* Life opinion that the question of whether another state would also be able to claim the same property items from the insurance company was not before the Court.[8]

*[Recently], the Supreme Court agreed to allow a group of 21 plaintiff states to file a complaint … to challenge Delaware's escheatment of unclaimed funds associated with uncashed "official checks" issued and sold by [MoneyGram].*

Three years later, in *Standard Oil Co. v. New Jersey*,[9] the Supreme Court allowed New Jersey to claim custody of unclaimed dividend, wage and vendor checks from Standard Oil Company on the grounds that this holder was incorporated in New Jersey, even though Standard Oil's books and records indicated that many of the owners of the unclaimed property items at issue were residing in states other than New Jersey. The Supreme Court again upheld the claimant state's right to take custody of the unclaimed property from the holder because the holder was subject to the due process jurisdiction of the claimant state: "[W]e see no reason to doubt that, where the debtor and creditor are within the jurisdiction of a court, that court has constitutional power to deal with the debt."[10] The Supreme Court ruled only upon the constitutionality of New Jersey's claim to escheat the property at issue and emphasized that "[t]he claim of no other state to this property is before us and, of course, determination of any right of the claimant state against New Jersey for the property escheated by New Jersey must await presentation here."[11]

However, in *Western Union Telegraph Co. v. Pennsylvania*, the Supreme Court held, in 1961, that Pennsylvania could *not* claim custody of unclaimed money order funds from Western Union because Pennsylvania would not be able to protect the company from the double liability that would result when New York, Western Union's state of incorporation (and possibly other states), laid claim to the same property items.[12] Again, the issue of which state possessed the superior right to claim the unclaimed money order funds in the possession of Western Union was not before the Court.

In *Texas v. New Jersey*,[13] the Supreme Court was finally presented with the question of which state had the superior right to escheat items of intangible property:

> The issue before us is not whether a defendant has had sufficient contact with a State to make him or his property rights subject to the jurisdiction of its courts, a jurisdiction which need not be exclusive … [W]e are faced here with the very different problem of deciding which State's claim to escheat is superior to all others.[14]

New Jersey was claiming the unclaimed property items in its capacity as the state of incorporation of the holder, Sun Oil Company. Pennsylvania contended that it should be allowed to claim custody of all of the property items because it was the state of commercial domicile of Sun Oil. Meanwhile, Florida and Texas were claiming custody of certain items of the property on the grounds that the owners of the property resided in that state, or in the case of Texas, that the unclaimed property item was recorded on the books and records of two Sun Oil offices located in Texas.[15]

The Supreme Court recognized in its *Texas v. New Jersey* opinion that the Court finally needed to create a straightforward set of rules that states would follow when they claimed custody of unclaimed property from holders

(and that holders would use to report that property to the correct states). The Court explained that "[s]ince the States separately are without constitutional power to provide a rule to settle this interstate controversy and since there is no applicable federal statute, it becomes our responsibility in the exercise of our original jurisdiction to adopt a rule which will settle the question of which State will be allowed to escheat the intangible property."[16] The Supreme Court also emphasized the importance of establishing priority rules that would be easy for holders and the states to administer. For example, the Court rejected Pennsylvania's suggestion that the unclaimed property items at issue in *Texas v. New Jersey* should be subject to escheat by the state of Sun Oil's principal place of business (*i.e.*, Pennsylvania) because the Court believed that:

> [A]pplication of the rule Pennsylvania suggests would raise in every case the sometimes difficult question of where a company's "main office" or "principal place of business" or whatever it might be designated is located. Similar uncertainties would result if we were to attempt in each case to determine the State in which the debt was created and allow it to escheat. Any rule leaving so much for decision on a case-by-case basis should not be adopted unless none is available which is more certain and yet still fair.[17]

Under the two common law priority rules that the Supreme Court adopted in its *Texas v. New Jersey* decision, unclaimed property escheats, first, to the state of the last known address of the apparent owner of the property, as shown in the holder's books and records.[18] The Supreme Court explained that:

> Adoption of such a rule involves a factual issue simple and easy to resolve, and leaves no legal issue to be decided … And by using a standard of last known address, rather than technical legal concepts of residence and domicile, administration and application of escheat laws should be simplified.[19]

The Supreme Court went on to provide a secondary priority rule that is applicable to "property owed persons (1) as to whom there is no record of any address at all, or (2) whose last known address is in a State which does not provide for escheat of the property owed them."[20] The Supreme Court decided that the holder's state of corporate domicile (*i.e.,* its state of incorporation) would be allowed to take custody of the property under this secondary priority rule, with the caveat that the state of last known address of the owner of the property could subsequently reclaim the property from the holder's state of corporate domicile if the owner's state were able to prove that the owner resided in that state or "if and when its law made provision for escheat of such property."[21] When the *Texas v. New Jersey* case was decided in 1965, a significant number of states had not yet enacted unclaimed property laws.[22]

For more than 50 years, the *Texas v. New Jersey* priority rules have governed state claims to custody of unclaimed property from holders. In *Pennsylvania v. New York*,[23] Pennsylvania asked the Supreme Court to create a special priority rule for unclaimed Western Union money orders that, by their nature, typically had no record of a last known address of the sender or the payee. Pennsylvania urged the Court to prevent a "windfall" to the holder's state of incorporation (*i.e.*, New York) by giving the first priority claim to the state where the money order had been purchased (and where the sender of the money order presumably resided).[24] The Supreme Court declined Pennsylvania's request that the Court create a special exception to its two priority rules for money orders because:

> [T]o vary the application of the *Texas* rule according to the adequacy of the debtor's records would require this Court to do precisely what we said should be avoided—that is, "to decide each escheat case on the basis of its particular facts or to devise new rules of law to apply to ever developing new categories of facts."[25]

Moreover, the Supreme Court justices drew some comfort from the fact that:

> Although Western Union has not kept ledger records of addresses [for the senders or payees of money orders], the parties stipulated, and the Special Master found, that money order applications have been retained in the company's records "as far back as 1930 in some instances and are generally available since 1941." Report 9. To the extent that creditor addresses are available from those forms, the "windfall" to New York will, of course, be diminished.[26]

The Supreme Court remanded the *Pennsylvania v. New York* case to the Special Master to give Pennsylvania and the other claimant states an opportunity to research Western Union's money order applications for the purpose of establishing last known addresses for the senders or payees of particular money order items. To the extent the claimant states were able to prove up last known addresses, those states would be entitled to claim custody of the money order funds pursuant to the primary priority rule of *Texas v. New Jersey.*[27]

 © 2017 CCH INCORPORATED AND ITS AFFILIATES. ALL RIGHTS RESERVED. 

In *Delaware v. New York*,[28] the Court was again asked to vary the application of the *Texas v. New Jersey* priority rules, this time to determine which state was entitled to take custody of unclaimed dividends, interest and other securities distributions in the possession of financial intermediaries such as banks, brokers and depositories that held title to the securities as "record owners" for the beneficial owner of the securities. As record owner of the securities, the financial intermediary was legally entitled to receive the securities distributions from the issuer of the securities, but the financial intermediary was then obligated to pass the securities distributions on to the next owner in the chain of title to the securities.[29] Because most of the unclaimed securities distributions could not be traced to an identifiable beneficial owner, let alone to a last known address of the owner, the question before the Supreme Court in the *Delaware v. New York* case was how the secondary priority rule of *Texas v. New Jersey* should be applied to the unclaimed securities distributions.

*It was inevitable that at some point the ambiguity of the terms "money order" and "third party bank check" … would give rise to a dispute among states as to which set of priority rules should be applied …*

The Supreme Court reaffirmed the applicability of the *Texas v. New Jersey* priority rules in its *Delaware v. New York* opinion and noted that no state may supersede these common law rules by seeking to establish a different priority under its state unclaimed property laws.[30] The Supreme Court then determined that the relevant holders of the unclaimed securities distributions were the financial intermediaries because the securities issuers already had satisfied their payment obligation by making the distributions of the dividend payments to the next record owner (*i.e.,* the financial intermediaries) in the chain of title to the securities. This was the critical legal teaching of the *Delaware v. New York* case. The Supreme Court went on to hold that unless New York were able to prove that specific unclaimed distributions were owed to specific beneficial owners (or other financial intermediaries) residing in New York, the secondary priority rule of *Texas v. New Jersey* would award custody of those unclaimed securities distributions to the state of incorporation (most likely Delaware) of the financial intermediary holding the unclaimed distributions.[31]

## Federal Statutory Priority Rules for Money Orders and Traveler's Checks

In 1974, Congress responded to the holding of the *Pennsylvania v. New York* case by enacting a special set of federal statutory priority rules for any unclaimed "sum payable on a money order, traveler's check, or other similar written instrument (other than a third party bank check) on which a banking or financial organization or a business association is directly liable."[32] These federal priority rules in the Federal Disposition Act were a minor part of P.L. 93-495, a major piece of financial institution legislation, and codified as 12 USC §§2501–2503.[33] Under these federal priority rules, such unclaimed funds are reportable, first, to the state in which the money order or traveler's check was purchased. If the books and records of the holder do not indicate the state of purchase (or the laws of that state do not provide for the escheat or custodial taking of the money order or traveler's check funds), then the unclaimed funds are reportable to the state of the principal place of business of the holder "until another state shall demonstrate by written evidence that it is the state of purchase."[34]

These federal statutory priority rules of the Federal Disposition Act effectively adopted the litigation position of Pennsylvania and other claimant states in the *Pennsylvania v. New York* case. As discussed earlier, Pennsylvania had argued that the state where the money order was purchased should be presumed to be the state of the sender's residence, essentially treating that state as the owner's state of last known address under the primary priority rule of *Texas v. New Jersey.*[35] The Supreme Court acknowledged in its *Pennsylvania v. New York* opinion that "Pennsylvania's proposal has some surface appeal," but the Court concluded that "we do not regard the likelihood of a 'windfall' for New York as a sufficient reason for carving out this exception to the *Texas* rule."[36]

Congress concluded otherwise when it enacted the Federal Disposition Act. This federal legislation included several Congressional findings to support the application of the state of purchase priority rule to money orders and traveler's checks. First, Congress found that "the books and records of banking and financial organizations and business associations engaged in issuing and selling money orders and traveler's checks do not, as a matter of business practice, show the last known addresses of purchasers of such instruments."[37] Second, Congress found that "a substantial majority of such purchasers reside in States where such instruments are purchased."[38] Third, Congress found that "the States wherein the purchasers of money orders and traveler's checks reside should, as a matter of equity

Wolters Kluwer®

among the several States, be entitled to the proceeds of such instruments in the event of abandonment."[39] Finally, Congress found that not distributing unclaimed money order and traveler's check funds among all the states where those instruments were sold would impose an undue burden on interstate commerce, thereby invoking Congress' authority under the Commerce Clause to enact these special federal priority rules for money orders and traveler's checks.[40]

Congress provided definitions in the Federal Disposition Act for the terms "banking organization," "business association" and "financial organization," but not for the critical terms "money order," "traveler's check" and "third party bank check."[41] This is unfortunate because it creates ambiguity as to exactly what types of payment instruments are considered to be a "money order," a "traveler's check" or an "other similar written instrument (other than a third-party bank check)" subject to the priority rules of the Federal Disposition Act. A "traveler's check" is commonly understood to be a prepaid check instrument with a specified denomination that a customer purchases in bearer form from a company like American Express and then makes payable to a particular merchant and countersigns in the presence of that merchant. Money orders are typically purchased at a Western Union office or a bank branch with the customer (sender) making payment to the issuer for the value of the money order (plus a fee) and furnishing the name of the payee that the Western Union or bank branch employee then inserts in the money order instrument. The money order instrument is then delivered to the payee at a Western Union office near the payee or, in the case of money order instruments sold at a bank branch, typically presented to the sender for his subsequent delivery to the payee. These Western Union or financial institution money orders are often used by consumers lacking a bank account on which the consumer could write a personal check or in situations where the consumer's payee will not accept a personal check from the consumer. Western Union money orders are clearly subject to the priority rules of the Federal Disposition Act because that legislation was enacted to reverse the holding of the *Pennsylvania v. New York* case. Money order instruments labeled as such and issued and sold by financial institutions fit within the language of 12 USC §2503 (*i.e.*, the financial institution is directly liable to make payment on the money order). As a result, financial institutions have generally applied the priority rules of the Federal Disposition Act to such money order instruments that they sell to consumers.

But what did Congress mean when it carved "third party bank checks" out of the types of payment instruments that are subject to the federal priority rules of 12 USC §2503? "Third party bank checks" is not a technical term of general usage in the financial industry. Banks and other financial institutions have long reported unclaimed certified checks, cashier's checks, teller's checks and other "official bank checks" to the states utilizing the common law priority rules of *Texas v. New Jersey*, and there is little reason to think that Congress meant to apply the place of purchase and principal place of business priority rules to these types of checks, many of which may have a payee name and address in the financial institution's records. Certified checks would not be subject to the priority rules of the Federal Disposition Act anyway because the financial institution only acts as a guarantor of the drawer's payment obligation with respect to the certified check rather than being directly liable on the check, as required by 12 USC §2503. However, a financial institution would be directly liable to make payment on a cashier's check. Indeed, the legislative history of the Federal Disposition Act discloses that the U.S. Treasury recommended to Congress that the provision that ultimately became 12 USC §2503 not apply to "third party payment bank checks." It would be reasonable, then, to conclude that Congress was contemplating cashier's checks and other "official checks" issued by financial institutions when it excluded "third party bank checks" from the scope of 12 USC §2503. Moreover, in light of Congress lumping "business associations" in with banking and financial organizations in Code Sec. 2503, it is arguable that cashier's check-type instruments issued by payment processing companies are also removed from the coverage of 12 USC §2503 and, consequently, remain subject to the *Texas v. New Jersey* priority rules. This is an open question, however, because the Federal Disposition Act does not provide definitions of the terms "money order" and "third party bank check," and no court has yet addressed this question.

## The *Arkansas v. Delaware* Case

It was inevitable that at some point the ambiguity of the terms "money order" and "third party bank check" in 12 USC §2503 would give rise to a dispute among states as to which set of priority rules should be applied to a three-party payment instrument involving a sender, a payee and an issuer of the payment instrument in possession of funds provided to the issuer by the sender. On June 9, 2016, the 21 states of Arkansas, Texas, Alabama, Arizona, Colorado, Florida, Idaho, Indiana, Kansas, Kentucky, Louisiana, Michigan, Montana, Nebraska, Nevada, North Dakota, Ohio, Oklahoma, South Carolina, Utah and West Virginia (the "Plaintiff States") filed an original jurisdiction action against Delaware in the U.S. Supreme Court claiming

 © 2017 CCH INCORPORATED AND ITS AFFILIATES. ALL RIGHTS RESERVED. 

that Delaware had impermissibly escheated unclaimed funds payable on "official checks" issued and sold by MoneyGram Payment Systems, Inc. ("MoneyGram") that, according to the Plaintiff States, MoneyGram should instead have reported and paid to them pursuant to the state of purchase priority rule of the Federal Disposition Act.[42] This litigation stemmed from an audit that the Plaintiff States had conducted of MoneyGram during the course of which the Plaintiff States discovered that Delaware had issued a letter ruling to MoneyGram directing the company to continue escheating its unclaimed official check funds to Delaware, MoneyGram's state of incorporation, pursuant to the secondary priority rule of *Texas v. New Jersey*. Delaware supported the Plaintiff States' motion for leave to file their complaint with the Supreme Court. On October 3, 2016, the Supreme Court granted that motion, consolidating this *Arkansas v. Delaware* case with two other cases that Pennsylvania and Wisconsin had filed against Delaware over this same issue in the federal district courts of Pennsylvania and Wisconsin.

*Although the Plaintiff States may resent Delaware's prominent and aggressive role with respect to state unclaimed property laws, the Plaintiff States should resist any urge to "stick it to Delaware" …*

Not surprisingly, the Plaintiff States and Delaware take different views of the payment processing business of MoneyGram and the nature of the official checks that it issues and sells to customers in the Plaintiff States. According to the Bill of Complaint of the Plaintiff States:

> This matter concerns instruments captioned "official checks" sold by MoneyGram, a company incorporated in Delaware, but which does business in all 50 States. Like a money order and a traveler's check, a customer obtains an official check by paying a transaction fee and the value that the customer seeks to have reflected on the official check. The customer then receives an instrument that is pre-printed with the value of the payment remitted by the customer. MoneyGram is directly liable for that amount, and its records do not reflect the purchaser's identity or the instrument's ultimate recipient, but MoneyGram does know where the instrument was purchased.[43]

The Bill of Complaint alleges that the MoneyGram official checks are generally sold at financial institutions.[44]

The Plaintiff States further allege that between May 2011 and March 2015 at least $162 million of MoneyGram official checks went uncashed or otherwise unredeemed and that these official checks constituted "other similar written instruments" within the meaning of the Federal Deposit Act and its place of purchase priority rule codified as 12 USC §2503.[45] The Plaintiff States acknowledge in their Bill of Complaint that the term "other similar written instrument (other than a third party bank check)"—and the terms "money order" and "traveler's check" for that matter—are not defined in 12 USC §2503 or elsewhere in the Federal Disposition Act. However, the Plaintiff States argue that, consistent with the common understanding of money order and traveler's check instruments, the term "other similar written instruments (other than a third party bank check)" must be read to mean instruments where a customer pays the value reflected, the issuer is directly liable and the issuer does not generally know the ultimate recipient.[46] The Plaintiff States argue that their proposed definition of the term "other similar written instrument (other than a third party bank check)" is consistent with "the purpose behind the Federal Disposition Act, which was intended to prevent one state—where many corporations maintain their domicile—from enjoying an inequitable windfall at the expense of 'the other 49 states where the purchasers of traveler's checks and money orders actually reside.'"[47] Of course, the Plaintiff States' proposed definition could cover a broad variety of check instruments that have traditionally been reported to the states utilizing the *Texas v. New Jersey* priority rules.

The Plaintiff States ultimately claim in their complaint, "[b]ecause a MoneyGram official check operates like a money order and a traveler's check, under the Federal Disposition Act, the State where a MoneyGram official check was purchased is 'entitled exclusively to escheat or take custody of the sum payable on such instrument, to the extent of that State's power under its own laws to escheat or take custody of such sum.' 12 U.S.C. 2503(1)."[48]

On the other hand, Delaware explained in its response brief in the *Arkansas v. Delaware* case that, according to the U.S. Tax Court's opinion in a 2015 case involving MoneyGram, "MoneyGram provides official check outsourcing services to financial institutions who do not want to provide their own bank checks, cashier's checks, and teller checks."[49] In the counterclaim that it filed on August 5, 2016, in the *Arkansas v. Delaware* case, Delaware alleges that official checks of the type that MoneyGram issues "were known and recognized monetary instruments at the time the [Federal Disposition Act] was enacted but were not included in the

scope of 12 U.S.C. § 2503."[50] In the absence of definitions of "money order" and "traveler's check" in the Federal Disposition Act, Delaware claims that those terms should be interpreted consistently with common usage and then points out that the MoneyGram official checks are not labeled as "money orders," they are capable of being issued in substantially larger dollar amounts than money orders usually are, and the official checks are treated differently than money orders under various federal regulations relating to monetary instruments.[51] Indeed, the Plaintiff States do not appear to be arguing either that the official checks constitute money orders within the meaning of the Federal Disposition Act. As for the meaning of the term "third party bank check" in 12 USC §2503, it appears from a review of the exhibits to the Plaintiff States' complaint that Delaware believes Congress was contemplating cashier's checks and other official checks on which a financial institution is directly liable and, because the MoneyGram official checks are utilized by financial institutions as a substitute for issuing their own cashier's checks and other official checks, the MoneyGram official checks should similarly be treated as "third party bank checks" excluded from the federal priority rules of 12 USC §2503.

## Conclusion

The *Arkansas v. Delaware* case presents a novel question: what sort of third-party payment instruments qualifies as a "money order, traveler's check or other similar written instrument (other than a third party bank check)" subject to the special priority rules of the Federal Disposition Act instead of the common law priority rules of *Texas v. New Jersey* that usually apply to unclaimed property items? At the point this column is being written, we only have the allegations in the Plaintiff States' complaint and Delaware's counterclaim. The Special Master in the *Arkansas v. Delaware* case will have to develop the facts with the assistance of the parties and reach a legal conclusion as to whether the MoneyGram officials checks are more like money orders, which would be subject to the priority rules of the Federal Disposition Act, or ordinary checks, including cashier's checks and other official bank checks, which have long been considered to be subject to the *Texas v. New Jersey* priority rules. The Supreme Court justices will then review the Special Master's report and ultimately decide this question of which set of priority rules apply to the MoneyGram official checks.

Although the Plaintiff States may resent Delaware's prominent and aggressive role with respect to state unclaimed property laws, the Plaintiff States should resist any urge to "stick it to Delaware" by asking the Supreme Court to refashion the *Texas v. New Jersey* priority rules to remove the holder's state of incorporation as the secondary priority rule. Those common law priority rules have proven over 50 years to be the easily administered rules that the Supreme Court intended for sorting out which state is able to claim a particular item of unclaimed property from the holder. It would be an unfortunate and unwarranted development if the statutory construction question presented in *Arkansas v. Delaware* were to cause the Supreme Court to revisit its *Texas v. New Jersey* priority rules.

Wolters Kluwer

ENDNOTES

1 *Texas v. New Jersey*, SCt, 379 US 674, 85 SCt 626 (1965).
2 *Pennsylvania v. New York*, SCt, 407 US 206, 92 SCt 2075 (1972).
3 *Delaware v. New York*, SCt, 507 US 490, 113 SCt 1550 (1993).
4 Act Secs. 601–603 of the Disposition of Abandoned Money Orders and Traveler's Checks Act (P.L. 93-495), tit. VI, codified as 12 USC §§2501–2503.
5 *Arkansas v. Delaware*, No. 146, Original (U.S., motion to file complaint granted on Oct. 3, 2016).
6 *Connecticut Mutual Life Insurance Co. v. Moore*, SCt, 333 US 541, 68 SCt 682 (1948).
7 333 US at 548.
8 *Id.*
9 *Standard Oil Co. v. New Jersey*, SCt, 341 US 428 (1951).
10 *Id.*, at 439.
11 *Id.*
12 *Western Union Telegraph Co. v. Pennsylvania*, SCt, 368 US 71, 76–77 (1961).
13 *Texas v. New Jersey*, SCt, 379 US 674, 85 SCt 626 (1965).
14 *Id.*, at 678–679.
15 *Id.*, at 675–676.
16 *Id.*, at 677.
17 *Id.*, at 680.
18 *Id.*, at 680–681.
19 *Id.*, at 681.
20 *Id.*, at 682 (emphasis added).
21 *Id.*
22 The Prefatory Note to the 1966 revisions to the 1954 Uniform Disposition of Unclaimed Property Act states that when the 1954 Uniform Act was being drafted "only ten states had adopted really comprehensive legislation covering the entire field of unclaimed property." In addition, the Supreme Court noted in its 1961 *Western Union Telegraph* decision that several states were then in the process of enacting or expanding the scope of their abandoned property laws.
23 *Pennsylvania v. New York*, SCt, 407 US 206, 92 SCt 2075 (1972).
24 *Id.*, at 210–211 (emphasis added).
25 *Id.*, at 215 (quoting from *Texas v. New Jersey*, SCt, 379 US at 679).
26 *Id.*, at 215.
27 *Id.*, at 215–216.
28 *Delaware v. New York*, SCt, 507 US 490, 113 SCt 1550 (1993).
29 *Id.*, at 495.
30 *Id.*, at 500.
31 *Id.*
32 12 USC §2503.
33 Act Secs. 601–603 of the Disposition of Abandoned Money Orders and Traveler's Checks Act (P.L. 93-495), tit. VI, codified as 12 USC §§2501–2503.
34 12 USC §2503 (1) and (2).
35 *Pennsylvania v. New York*, SCt, 407 US at 211–212.
36 *Id.*, at 214.
37 12 USC §2501(1).
38 12 USC §2501(2).
39 12 USC §2501(3).
40 12 USC §2501(4).
41 12 USC §2502.
42 *Arkansas v. Delaware*, No. 146, Original (U.S., motion for leave to file complaint granted Oct. 3, 2016).

 © 2017 CCH INCORPORATED AND ITS AFFILIATES. ALL RIGHTS RESERVED. 

[43] *Arkansas v. Delaware*, Bill of Complaint ¶ 10.
[44] *Id.*
[45] Bill of Complaint ¶¶ 6, 7 and 11.
[46] Bill of Complaint ¶ 7.
[47] Bill of Complaint ¶ 7 (quoting from 119 Cong. Rec. S 9749–9750 (daily ed. May 29, 1973).
[48] Bill of Complaint ¶ 12.
[49] *Arkansas v. Delaware*, Delaware's Brief in Response to Plaintiff States' Motion for Leave to File Bill of Complaint at 3.
[50] *Arkansas v. Delaware*, Delaware's Counterclaim ¶ 10.
[51] *Id.*, at ¶ 11.

This article is reprinted with the publisher's permission from the JOURNAL OF PASSTHROUGH ENTITIES, a bi-monthly journal published by Wolters Kluwer. Copying or distribution without the publisher's permission is prohibited.
To subscribe to the JOURNAL OF PASSTHROUGH ENTITIES or other Wolters Kluwer Journals please call 800-449-8114 or visit CCHGroup.com. All views expressed in the articles and columns are those of the author and not necessarily those of Wolters Kluwer or any other person. © CCH Incorporated. All Rights Reserved.

Wolters Kluwer